# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**LORA H.,**[1]

      **Plaintiff,**

**v.**                                          **Case No.: 2:22-cv-00211**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**


### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 8).

The undersigned has fully considered the evidence and the arguments of counsel.

---

[1] The Court lists only the first name and last initial of any non-government parties in Social Security opinions pursuant to the October 31, 2022 Standing Order in this District, which adopts the recommendation of the May 2018 Judicial Conference Committee on Court Administration and Case Management concerning privacy of personal and medical information.

For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On October 22, 2019, Plaintiff Lora H. ("Claimant") protectively filed for DIB, alleging a disability onset date of October 16, 2019 due to "rheumatoid arthritis, osteoarthritis, multilevel degenerative disc w/levoscoliosis, severe spinal stenosis, sacroiliitis, Raynaud's disease, and low bone density." (Tr. at 272, 275, 292-93) (cleaned up). After the Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration, Claimant filed a request for an administrative hearing, which was held on September 9, 2021 before the Honorable M. Drew Crislip, Administrative Law Judge (the "ALJ"). (Tr. at 127-45). By written decision dated September 27, 2021, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 106-26). The ALJ's decision became the final decision of the Commissioner on March 8, 2022 when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action, seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Claimant filed a Brief in Support of Complaint, (ECF No. 7), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 8), to which Claimant filed a reply, (ECF No. 9). Consequently, the matter is fully briefed and ready for resolution.

## II.     <u>Claimant's Background</u>

Claimant was 53 years old on her alleged disability onset date and 55 years old on the date of the ALJ's decision. (Tr. at 156). She completed high school, communicates in English, and previously worked as a loan assistant and office manager. (Tr. at 303, 305).

## III.     <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the

measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. WeinBerger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for DIB through December 31, 2024. (Tr. at 111, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 16, 2019, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: inflammatory arthritis, fibromyalgia, osteoarthritis of the knees, degenerative disc disease of the lumbar spine, and Raynaud's disease of the feet. (*Id.*, Finding No. 3). The ALJ considered Claimant's osteoarthritis in her hands, but the ALJ found that the impairment was non-severe. (Tr. at 112).

Under the third inquiry, the ALJ found that Claimant did not have an impairment

4

or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 112-14, Finding No. 4). The ALJ determined that from October 16, 2019 to December 8, 2020, Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) within the following parameters: She could lift, push, pull, and carry 20 pounds occasionally and 10 pounds frequently; could sit for six hours and stand and /or walk for six hours in an 8-hour workday; must alternate between sitting to standing or walking for 2-3 minutes after every two hours and from standing or walking to sitting for 2-3 minutes after every hour, always with the capacity to remain on task during position changes, some of which would be covered by time off task and typical breaks. She could operate foot control occasionally and hand controls frequently. She could reach in all directions, handle, finger, and feel frequently. She could stoop or climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds, or balance (navigate uneven or slippery terrain), stoop, kneel, crouch, and crawl. The claimant could never work at unprotected heights, in proximity to moving mechanical parts of dangerous machinery, in the operation of a motorized vehicle, temperature extremes of cold or hot, or vibration. She could occasionally work in weather or in humidity and wetness. In addition to normal breaks, she would be off task 10 percent of time in an 8-hour workday.

(Tr. at 114-18, Finding No. 5).

At the fourth step, the ALJ determined that from October 16, 2019 to December 8, 2020, Claimant could perform her past relevant work as an office manager and bank loan assistant. (Tr. at 118, Finding No. 6). The ALJ made an alternate finding based on Claimant's past work experience, age, and education that she could also engage in other substantial gainful activity from October 16, 2019 to December 8, 2020. (Tr. at 118-19, Finding 7). The ALJ considered that (1) Claimant was born in 1966 and was defined as an individual closely approaching advanced age prior to December 9, 2020; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled" regardless of whether she had

5

transferable skills. (Tr. at 118). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that from October 16, 2019 to December 8, 2020, Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a non-postal mail clerk, file clerk, and office helper. (Tr. at 118-19).

For the remainder of the period, beginning on December 9, 2020, the ALJ found that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can lift, push, pull, and carry 10 pounds occasionally and less than 10 pounds frequently; could sit for six hours and stand and /or walk for two hours in an 8-hour workday; must alternate between sitting to standing or walking for 2-3 minutes after every hour and from standing or walking to sitting for 2-3 minutes after every half hour, always with the capacity to remain on task during position changes, some of which would be covered by time off task and typical breaks. She could operate foot controls occasionally and hand controls frequently. She could reach in all directions, handle, finger, and feel frequently. She could stoop or climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds, or balance (navigate uneven or slippery terrain), stoop, kneel, crouch, and crawl. The claimant could never work at unprotected heights, in proximity to moving mechanical parts of dangerous machinery, in the operation of a motorized vehicle, temperature extremes of cold or hot, or vibration. She could occasionally work in weather or in humidity and wetness. In addition to normal breaks, she would be off task 10 percent of time in an 8-hour workday.

(Tr. at 120-21, Finding No. 8).

The ALJ concluded that Claimant could still perform her past relevant work as an office manager and bank loan assistant beginning on December 9, 2020. (Tr. at 121, Finding No. 9). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 121, Finding No. 10).

## IV.  Claimant's Challenges to the Commissioner's Decision

Claimant argues that the Commissioner's decision is not supported by substantial

6

evidence because the ALJ did not properly account for the total limiting effects of her impairments in the RFC analysis. (ECF Nos. 7, 9). Specifically, Claimant contends that the ALJ did not properly evaluate the medical opinion evidence and her subjective limitations. (*Id.*). In response to Claimant's challenges, the Commissioner argues that Claimant did not meet her burden of proving disability, substantial evidence supports the ALJ's RFC assessment, and the ALJ properly evaluated Claimant's subjective symptoms. (ECF No. 8). Claimant filed a reply to the Commissioner's response, asserting that the Commissioner simply parrots the ALJ's defective reasoning and selective citations to the evidence. (ECF No. 9).

## V.   **Relevant Evidence**

The undersigned examined all of the evidence in the record. The following evidence is most relevant to the issues in dispute.

### A.  *Treatment Records*

On August 27, 2018, Claimant underwent a lumbar MRI due to back pain. It showed multilevel degenerative disc and degenerative joint disease with levoscoliosis at L2-3; partial fusion of the L2 and L3 vertebral bodies; moderately severe spinal stenosis at L3-4; bilateral foraminal encroachment at L3-4; and mild foraminal encroachment at L4-5. (Tr. at 518). Claimant participated in physical therapy. She completed her eighth physical therapy session for low back pain on December 12, 2018. (Tr. at 594). Claimant reported that the session provided good relief; she experienced days of relief after her last session; and she purchased a lumbar support for her occupational duties. (*Id.*).

Claimant presented to Melissa D. Lilly, PA-C, on March 21, 2019 for an initial consultation regarding low back pain. (Tr. at 395). Claimant stated that her symptoms began in September 2018 and occurred gradually. (*Id.*). She complained of back problems

and arthritis, but denied fatigue and neurologic issues, such as difficulty with balance or coordination. (Tr. at 395-96). On examination, PA-C Lilly recorded bilateral paravertebral and sacral sulcus/joint line tenderness, positive bilateral straight leg raising tests, 3/5 muscle strength on the right and 4/5 on the left, and brisk reflexes. (Tr. at 396). PA-C Lilly diagnosed Claimant with lumbar stenosis with claudication and lumbar spondylosis without myelopathy or radiculopathy. (*Id*.). She noted that Claimant failed conservative treatment methods for her lumbar and radicular pain, including physical therapy, heat, ice, rest, anti-inflammatory medication, and analgesics. (Tr. at 397). PA-C Lilly concluded that the examination findings were consistent with an MRI of Claimant's spine which showed disc pathology resulting in nerve root compression. (*Id*.). Therefore, PA-C Lilly scheduled Claimant for lumbar epidural steroid injections. (*Id*.). Andrew C. Thymius, D.O., administered a lumbar injection in Claimant's L3-4 vertebrae on April 16, 2019. (Tr. at 398).

Rheumatologist Wassim S. Saikali, M.D., examined Claimant on May 14, 2019 concerning pain and discomfort in different joints. (Tr. at 427). Claimant acknowledged that the steroid injections were providing some relief. (*Id*.). She had normal range of motion in all of her joints and spine except for her proximal interphalangeal (PIP) joints. (Tr. at 427-28). Dr. Saikali documented kyphoscoliosis in Claimant's back, but no joint swelling. (Tr. at 428). He stated that most of Claimant's symptoms were attributed to osteoarthritis and chronic pain, and he was thus limited as to what he could do regarding her back at that time, but he nonetheless adjusted her medication. (*Id*.).

On May 28, 2019, Claimant reported to PA-C Lilly that the lumbar injection provided 40 percent relief from back pain for the last 41 days. (Tr. at 400). She rated her pain three to four on a 10-point scale and stated that she had no complications from the

procedure. (Tr. at 400). Claimant complained of back problems and arthritis, but denied fatigue and neurologic issues, such as difficulty with balance or coordination. (*Id.*). Dr. Thymius administered another sacroiliac joint injection on July 11, 2019. (Tr. at 405).

During follow-up with Dr. Saikali on August 15, 2019, Claimant expressed that her main problem was her back, which was achy, stiff, and sore at the end of the day. (Tr. at 430). She said that the steroid shots were not "helping much." (*Id.*). Claimant further complained of mild dull achy pain and stiffness in her hands, but she stated that her hand pain was not as bad as her back pain. (*Id.*). She still had normal range of motion except in her PIP joints and ankles, presented in no acute distress, and had degenerative hypertrophy in knees, but no effusion in her knees or ankles. (Tr. at 430-31). Dr. Saikali increased Claimant's dosage of Lodine for her back pain. (*Id.*).

On August 22, 2019, Claimant advised PA-C Lilly that the sacroiliac joint injection relieved her back pain by 40 percent, but only for two days. (Tr. at 407). She alleged that the pain was so severe that it caused her to shake, but she rated her pain four to five on a 10-point scale at that visit. (*Id.*). Claimant complained of back problems and arthritis, but she denied fatigue and neurologic issues. (*Id.*). On examination, she had left-sided paravertebral and bilateral sacral sulcus/joint line tenderness, a positive straight leg raising test on the right, and a positive thigh thrust test. (Tr. at 408). Claimant received another sacroiliac joint injection from Dr. Thymius on September 5, 2019. (Tr. at 410).

On October 10, 2019, Claimant presented to primary care physician Whitney Boggs, M.D. She complained of right hip pain extending down her leg, white hands, purple toes, and swollen knuckles. (Tr. at 475, 478). Claimant advised Dr. Boggs that she worked in an office in a job that required her to lift, type, and write. (Tr. at 477-78). She claimed that she could not continue doing the job and was going to seek disability. (*Id.*).

Claimant did not have any edema or weakness in her extremities, and her pulses were normal, but Dr. Boggs observed that Claimant's toes were purple and her knuckles were swollen. (*Id*.). Dr. Boggs diagnosed Claimant with low back pain, rheumatoid arthritis, osteoarthritis, and Raynaud's disease. (Tr. at 478-79).

Claimant followed up with Dr. Boggs on October 17, 2019 for right hip/thigh pain and some numbness from the knee down. (Tr. at 471). Claimant reported that her knees ached, which caused her to fall. (Tr. at 474). Dr. Boggs recorded the same examination findings of purple toes and swollen knuckles, but no edema or weakness in Claimant's extremities with normal pulses. (*Id*.). Dr. Boggs diagnosed Claimant with peripheral vascular disease, pain in right lower limb, and bilateral hand pain. (*Id*.). She prescribed medications and ordered hand x-rays. (*Id*.). The hand x-rays taken on October 23, 2019 showed mild osteoarthritis in the right radiocarpal joint, mild positive ulnar variance on the right, and mild soft tissue prominence lateral to the left distal. (Tr. at 484).

On October 24, 2019, Claimant advised PA-C Lilly that her last sacroiliac joint injection reduced her pain by less than 75 percent for 15 days. (Tr. at 412). She stated that she was more active, able to clean her house and exercise, and required less non-steroidal anti-inflammatory drugs during the duration of the relief. (*Id*.). However, during the examination, Claimant rated her pain 10 on a 10-point pain scale. (*Id*.). She complained of back problems and arthritis, but denied fatigue and neurologic issues, including difficulty with balance or coordination. (*Id*.). PA-C Lilly stated that because the sacroiliac injections revealed that the sacroiliac joint was the source of Claimant's pain, she planned to proceed with sacroiliac joint radiofrequency ablation to offer longer lasting relief. (Tr. at 414).

Claimant followed up with Dr. Boggs on November 20, 2019, complaining that her

right knee was hard to bend, gave out on her, and seemed swollen. (Tr. at 465). On examination, Claimant had crepitus in both knees, purple toes, and swollen knuckles, but no edema or weakness in her extremities and normal pulses. (Tr. at 467-68.). Dr. Boggs ordered x-rays to evaluate Claimant's unspecified knee pain and prescribed Cymbalta for her chronic pain. (Tr. at 468). Claimant underwent the sacral radiofrequency ablation on December 2, 2019. (Tr. at 415). Her knee x-rays shortly thereafter on December 6, 2019 showed mild to moderate joint space narrowing in the right medial compartment, but no significant effusion bilaterally. (Tr. at 483).

On December 9, 2019, Claimant reported to Dr. Saikali that she was not sure if the ablation worked or not. (Tr. at 433). She reported numbness and tingling in her lower extremities and soreness in both hands. (*Id.*). On examination, Dr. Saikali noted that Claimant had limited range of motion in her PIP joints and tenderness in both knees, but no swelling in any joints and no limited range of motion or tenderness anywhere else in her body. (Tr. at 433-34). Claimant had degenerative hypertrophy in her knees, but no effusion or instability to varus or valgus stress. (Tr. at 434). Her rapid 3 test showed high rheumatoid arthritis activity, although her most recent laboratory results were normal including the c-reactive protein test. (Tr. at 434).

During follow-up with Dr. Boggs on February 20, 2020, Claimant stated that she was still having pain in her thigh, knee, and hip; her feet were currently throbbing and aching; and her toes were chronically purple with white discoloration on her feet, which was worse when standing. (Tr. at 460). Claimant reported that she was still using leg pumps and keeping her legs elevated to relieve numbness and swelling. (*Id.*). If she did not do so, the pain purportedly became severe, the discoloration worsened, and it became difficult to walk. (*Id.*). Claimant further complained of chronic knee pain and severe pain

11

in her hands with overuse or cold. (Tr. at 461). On examination, Claimant did not have edema or weakness in her extremities, and her pulses were normal, but her feet were cold to the touch, toes were purple, right foot was white on the dorsal aspect, knuckles were swollen, and knees had bilateral crepitus. (*Id.*). Dr. Boggs diagnosed Claimant with Raynaud's disease without gangrene that was worsening in her feet, rheumatoid arthritis, and chronic pain. (Tr. at 461-62). She prescribed Cymbalta for pain. (*Id.*).

On March 10, 2020, Claimant reported to Dr. Saikali that she was still sore and achy in different areas, but medication helped. (Tr. at 448). Her examination findings were normal other than some bluish discoloration on her right second toe and tenderness in her ankles. (Tr. at 449). She had normal range of motion in all joints and her spine, no swelling, and no other tenderness. (Tr. at 449-50). Dr. Boggs noted on May 20, 2020, that Claimant walked without restrictions. (Tr. at 541). Her examination findings were consistent with Claimant's prior visit other than she did not record bilateral knee crepitus. (Tr. at 542-43). This time, she diagnosed Claimant with Raynaud's disease without gangrene that was worsening in her feet, rheumatoid arthritis, and osteoporosis. (Tr. at 543). She continued Claimant on medications. (Tr. at 542-43).

On June 10, 2020, Claimant told Dr. Saikali that she was in pain all of the time, which was interfering with her mobility and function. (Tr. at 526). She complained of tenderness in her thumbs, demonstrated decreased range of motion in second and third distal interphalangeal (DIP) joints, but she otherwise demonstrated full range of motion and no swelling or tenderness. (Tr. at 526-27). Dr. Saikali believed that Claimant's symptoms were more attributable to chronic pain and fibromyalgia than rheumatoid arthritis, but he ordered a blood test to evaluate. (Tr. at 527). During follow-up on October 13, 2020, Claimant advised Dr. Saikali that medication was helping, but she was still

having pain and discomfort in her hands, wrists, elbows, shoulders, knees, and diffused generalized aches and pains without any specific swelling. (Tr. at 564). On examination, Claimant complained of mild tenderness in the trapezia nuchal area, but otherwise had no tenderness, swelling, or restricted range of motion. (Tr. at 564-65).

Claimant presented to Amanda Davis, PA-C, on December 9, 2020, concerning Raynaud's disease. (Tr. at 585). She said that her feet turned purple intermittently since 2016, but the discoloration resolved after elevating her feet for less than two minutes. (*Id.*). Claimant had edema and pain in her right foot and normal peripheral pulses bilaterally. (Tr. at 585-86). PA-C Davis ordered an x-ray. (*Id.*). The right foot x-ray obtained the following day reflected mild degenerative changes of the PIP joints and very mild periarticular osteopenia of the forefoot, but no soft tissue abnormality or acute pathology. (Tr. at 592). Claimant told Dr. Boggs on January 6, 2021 that her right foot was improved, but she now had problems with her left foot. (Tr. at 577). Claimant displayed normal gait, full lower extremity strength, and normal peripheral pulses bilaterally, although she had trace pedal edema, purple discoloration on her feet, and mild edema in her right toes. (Tr. at 580). Dr. Boggs referred Claimant to a vascular specialist for Raynaud's disease. (*Id.*).

On January 20, 2021, Herbert Oye, D.O., of Global Vascular and Wound Care examined Claimant. He noted edema in Claimant's right upper extremity, blue discoloration and coolness to the touch in her feet, delayed capillary refill greater than five seconds, and dry skin breakdown on the distal tips of her toes without drainage. (Tr. at 560). Claimant's gait and station remained intact and she ambulated without assistance. (*Id.*). Claimant followed up with Dr. Saikali on April 27, 2021 regarding seropositive rheumatoid arthritis, fibromyalgia, and osteoarthritis. (Tr. at 567). She

complained of swelling and discomfort in her joints, but her function was not limited, and she maintained normal range of motion in all of her upper and lower extremity joints and her entire spine. (Tr. at 567-68). Claimant had minimal degenerative nodules in hands, Heberden Bouchard nodes, and mild tenderness in the trapezia and nuchal area. (Tr. at 568). Dr. Saikali refilled her medications. (*Id.*).

Claimant asked Dr. Boggs for a steroid injection on May 25, 2021 because her "sciatic nerve [was] acting up again." (Tr. at 574). She had normal gait and walked without restrictions, full lower extremity strength, trace pedal edema, purple discoloration on her feet, mild edema in her right toes, normal peripheral pulses bilaterally, and tight tender paraspinal muscles. (Tr. at 575-77). Dr. Boggs diagnosed Claimant with chronic pain and sciatica. (Tr. at 577). On July 27, 2021, Dr. Saikali recorded that Claimant maintained normal range of motion in all of her upper and lower extremity joints and spine. (Tr. at 635-36). She had decreased range of motion in her second and third DIP joints, Heberden Bouchard nodes, tenderness in the trapezia and nuchal area, and degenerative hypertrophy in her knees, but no knee effusion or instability. (Tr. at 636).

### B. Evaluations, Opinions, and Prior Administrative Findings

On January 16, 2020, state agency physician Narendra Parikshak, M.D., assessed that Claimant could perform light exertional work with occasional postural activities, except no climbing of ladders, ropes, or scaffolds, and no concentrated exposure to extreme cold, wetness, or vibration and not even moderate exposure to hazards. (Tr. at 152-53). Isidro Amigo, M.D., affirmed this assessment on May 5, 2020. (Tr. at 161-63).

Dr. Boggs submitted a medical opinion dated August 17, 2021, noting that she had treated Claimant since October 15, 2015 (Tr. at 646). Dr. Boggs opined that Claimant was in constant pain and incapable of even low stress jobs due to pain and medication. (Tr. at

14

647). She assessed that Claimant could not walk at all without rest or severe pain; sit or stand for five minutes before needing to move positions; sit and stand/walk for less than two hours in a workday; needed to walk around more than seven times in a workday for one to five minutes; must shift positions; needed more than seven unscheduled breaks during the workday for six to ten minutes; rarely lift and carry less than ten pounds and never ten pounds or more; rarely twist and move her head; never hold her head in one position, stoop, crouch/squat, climb ladders or stairs, handle, finger, or reach; would have more than than four work absences per month; and could not work since October 17, 2019. (Tr. at 646-51).

Gilberto Munoz, M.D., testified during Claimant's administrative hearing on September 9, 2021. He opined that from, October 16, 2019 to December 8, 2020, Claimant could perform light exertional work involving occasional postural activities, except for never climbing ladders, ropes, or scaffolds; occasional exposure to extreme cold and heat and vibration; and no exposure to unprotected heights or moving mechanical parts. (Tr. at 133-34). Due to the objective evidence concerning Claimant's Raynaud's disease, Dr. Munoz assessed that, beginning on December 9, 2020, Claimant's RFC was reduced to sedentary exertional work with the same postural and environmental limitations that he described. (Tr. at 133).

### C. Claimant's Statements

In a function report dated December 13, 2019, Claimant alleged that she could not button or unbutton, had a hard time pulling on pants, could not step into the bathtub alone, could not stand in the shower very long, had to take multiple breaks when drying and fixing her hair because of hand cramps and back pain while standing, and could not squeeze nail clippers. (Tr. at 324). She prepared simple meals with assistance from her

spouse. (Tr. at 325). She also did laundry and dusted weekly, but she took frequent breaks and needed help to get laundry out of the dryer and could not stretch when dusting. (*Id*.). Claimant stated that she drove but could not go out alone because she needed assistance with steps. (Tr. at 326). She shopped bi-weekly, taking breaks while doing so. (Tr. at 326). Claimant asserted that she was unable to lift/hold objects without back and hand pain, and she could not go up or down stairs without help. (Tr. at 328). She allegedly could only walk 15 feet before needing to stop and rest for five to ten minutes. (*Id*.). Claimant stated that the side effects from her medications included nausea, vomiting, diarrhea, shaking, and hair loss. (Tr. at 330). Claimant expressed the same limitations and side effects in a function report dated February 23, 2020. (Tr. at 358-65).

During the September 9, 2021 administrative hearing, Claimant testified that she had good and bad days. (Tr. at 136). On a bad day, she could not move well due to issues with her back and hips; she had sharp pains extending down her legs and feet; and her hands locked up, which prevented her from gripping anything. (Tr. at 136). Claimant stated that she felt fatigued "about all the time." (Tr. at 137). Due to Reynaud's Disease, her fingers became completely numb and turned white, her toes were blue 99 percent of the time, and her feet "muddle[d]" on the bottom when she stood on them for five minutes or more and they were "like mush." (*Id*.). To ease her symptoms, she elevated her feet as much as possible, took muscle relaxers, soaked in warm baths, and tried to keep anything from rubbing sores on the tips of her toes. (*Id*.). Claimant testified that the pain was distracting; the muscle relaxers made her sleepy, dizzy, and shaky; and the Humira for her rheumatoid arthritis weakened her immune system. (Tr. at 138). Claimant stated that she could not sit for very long because her feet turned blue, burned, and hurt, and her hips and back hurt. (*Id*.).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    <u>Discussion</u>

Claimant argues that the ALJ failed to properly account for the total limiting effects of her impairments in the RFC analysis by erroneously analyzing the medical opinions and her subjective allegations. (ECF No. 9 at 1). SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."

SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the **most** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR § 404.1545(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the

evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

### A. Opinion Evidence

Claimant contends that the ALJ did not properly consider the medical opinions in this matter, particularly the opinion of her treating provider, Dr. Boggs. Claimant protectively filed for DIB in 2019. Thus, the revised regulation regarding opinion evidence, which applies to claims filed on or after March 27, 2017, governs Claimant's application. Under the revised regulation, the ALJ must evaluate the persuasiveness of all medical opinions, which are defined as the following:

> [A] statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting; (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. §§ 404.1513(a)(2), 404.1520c.

The regulatory factors that the ALJ must consider when evaluating medical opinions include supportability; consistency; relationship of the source to the claimant; length, purpose, and extent of treatment relationship; frequency of examinations; whether the source examined the claimant; the source's specialization; and other factors. *Id.* at § 404.1520c(c). As relevant to this matter, "other factors" refers to evidence that tends to support or contradict a medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(c)(5). It "includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* When the SSA considers a medical source's familiarity with the other evidence in a claim, it will also consider whether new evidence received after the medical source made his or her medical opinion or prior administrative medical finding made the medical opinion or prior administrative medical finding more or less persuasive. *Id.*

The supportability and consistency of the opinions are of primary importance. The ALJ must articulate his or her consideration of the factors of supportability and consistency, but the ALJ is not required to explain how he or she considered the other regulatory factors. *Id.* at § 404.1520c(b)(2). The term "supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at § 404.1520c(c)(1). Furthermore, the law explains that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is

with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s)" are. *Id*. at § 404.1520c(c)(2).

In this case, the ALJ thoroughly considered Dr. Boggs's opinion. (Tr. at 117). However, the ALJ found that the extreme limitations that she assessed were not persuasive because they were not supported by or consistent with the objective evidence. (*Id*.). The ALJ noted the mild abnormalities in Claimant's hand x-rays, Dr. Boggs's own findings that Claimant had full muscle strength, Claimant's reports of significant improvement with medication and repeated denials of issues with coordination, and Claimant's function reports. (Tr. at 117). In that regard, the ALJ noted that Claimant confirmed that she had no problem feeding herself, using the toilet, or driving, and she could do laundry, dust, prepare frozen foods or sandwiches with assistance, shop in stores or on the computer twice per week for approximately two to three hours with breaks, and go out to eat once per week. (*Id*.). The ALJ remarked that Dr. Boggs's opinion that Claimant could never use her hands, fingers, or arms for reaching, fine manipulation, grasping, turning, or twisting objects was inconsistent with the evidence. (*Id*.).

Claimant cites evidence which she considers to be consistent with Dr. Boggs's opinion, including tenderness in her spine, hips, knees, and ankles; some positive straight leg raising, thigh thrust, distraction, and compression tests; decreased range of motion in some of her PIP and DIP joints and ankles; degenerative hypertrophy and crepitus in her knees; swollen knuckles, Heberden and Bouchard nodes, and degenerative nodules in her hands; purple and blue discolored toes and feet; very cold feet; whiteness on the dorsal right foot; dry skin breakdown on the distal tips of her toes; and delayed capillary refill greater than five seconds. (ECF No. 7 at 10). In addition, Claimant references her 2018

lumbar MRI, injections and ablation, and x-rays of her hands, knees, and feet. (*Id.* at 10-11). Claimant maintains that the mild hand x-ray findings and normal muscle strength on two examinations does not trump the other abnormal findings, which were not minimal, as the ALJ concluded. (*Id.* at 13). Also, Claimant contends that the ALJ's other rationales regarding improvement with medication and inconsistency with the record were highly selective references to the record and not logical or reasonable interpretations of the evidence. (*Id.* at 13-14). She points out that some of the evidence that the ALJ cited predated the onset of disability and one page was blank. (*Id.*).

As an initial matter, Claimant likewise relies on evidence which predated her alleged onset date to support her argument that she is disabled. For instance, she points to her lumbar MRI dated in August 2018. In any event, the ALJ discussed many of the records that Claimant argues were consistent with Dr. Boggs's opinion, and his analysis fairly represents the evidence as a whole. (Tr. at 112-17). Claimant does not identify any critical conflicting evidence that the ALJ failed to consider. Rather, she asks the Court to review the record that the ALJ evaluated and reach different conclusions based on the same pieces of evidence. Precisely as the Commissioner indicated, it is not the Court's role in reviewing the agency's decision to reweigh evidence and reach independent determinations that second-guess the ALJ's findings. Claimant argues that the ALJ's reasons for discounting Dr. Boggs's opinion were specious and unfair. However, the ALJ very carefully accounted for the evidence and concluded that Claimant was significantly functionally limited due to her impairments. He developed an RFC that restricted Claimant to an extremely limited range of light and then sedentary work for the applicable time periods. The ALJ provided good reasons in support of his analysis that Dr. Boggs's opinion of work-preclusive limitations was not persuasive. As shown below, there is more

than a scintilla of evidence to support that determination.

For instance, looking at Claimant's more recent records in January 2021, despite trace pedal edema, purple discoloration on her feet, and mild edema in the toes of her right foot, Dr. Boggs documented that Claimant had normal gait, full lower extremity strength, and normal peripheral pulses bilaterally. (Tr. at 580). Dr. Oye examined Claimant later that month and assessed that Claimant's feet were cold to the touch with discoloration, dry skin breakdown on the toes, and delayed capillary refill. (Tr. at 559-60). Yet, Claimant's gait and station remained intact, and she ambulated without assistance. (Tr. at 560). Claimant complained of swelling and discomfort in her joints to Dr. Saikali in April 2021. (Tr. at 567). She had minimal degenerative nodules in her hands, Heberden Bouchard nodes, and mild tenderness in the back of her neck, but her function was not limited, and she had normal range of motion in all of her upper and lower extremity joints and entire spine. (Tr. at 567-68). In May 2021, Claimant requested a steroid injection from Dr. Boggs because her sciatica was "acting up again." (Tr. at 574). Despite purple discoloration in her feet, the same edema previously noted, and tight paraspinal muscles, Claimant had normal gait, full lower extremity strength, and normal peripheral pulses and walked without restrictions. (Tr. at 575-77). As late as July 2021, Claimant maintained normal range of motion in all of her upper and lower extremity joints and spine. (Tr. at 635-36). She had decreased range of motion in her second and third DIP, Heberden Bouchard nodes, tenderness in the back of her neck, and degenerative hypertrophy in her knees but no effusion or instability. (Tr. at 636). These more recent records in addition to the other evidence supports the ALJ's conclusion that Dr. Boggs's opinion that Claimant had severe functional limitations was not persuasive. While Claimant might disagree with the ALJ's evaluation of the evidence, the analysis was

not misrepresentative or flawed under the substantial evidence standard.

Claimant next complains that the ALJ found that Dr. Munoz's familiarity with the evidence in the file rendered his opinions more persuasive, while at the same time the ALJ simply ignored the importance of Dr. Boggs's long treatment history of Claimant in evaluating her opinion. (ECF No. 7 at 11). Claimant indicates that the new regulatory scheme concerning opinion evidence involves a two-step process which first required the ALJ to assess whether the medical opinions were consistent with and supported by the evidence, and, only if multiple opinions were equally persuasive, then the ALJ could proceed to the second step and consider the other factors such as familiarity with the evidence to "break the tie." (*Id.* at 4-5). On that basis, Claimant claims that Dr. Munoz's familiarity with the evidence in the record should not have been considered in assessing the threshold question of whether his opinion was persuasive.

A plain reading of the regulatory text disproves that assertion. The regulation very clearly provides that the ALJ should consider the factors listed in 20 C.F.R. § 404.1520c(c)(1)-(5) in evaluating medical opinions. 20 C.F.R. § 404.1520c(a). The ALJ must articulate his or her consideration of the first two factors of supportability and consistency, but the ALJ may or may not discuss the "other factors that tend to support or contradict a medical opinion or prior administrative medical finding," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(a), (b)(2), (c)(5).

Here, the ALJ very clearly articulated his analysis of the supportability and consistency of Dr. Munoz and Dr. Boggs's opinions, as required, and additionally noted Dr. Munoz's familiarity with the full scope of the evidence in the record. The ALJ found

that Dr. Munoz's opinion was persuasive because it was supported by and consistent with the objective evidence, physical examinations, and Claimant's conservative care. Moreover, Dr. Munoz was the only medical doctor to have reviewed the *entire* pertinent documented record. (Tr. at 116). Therefore, the ALJ precisely complied with the regulation. Claimant fails to establish any reason that the ALJ's consideration of Dr. Munoz's familiarity with the record was improper, or that it obligated the ALJ to discuss other factors with respect to Dr. Boggs's opinion. Dr. Munoz testified during Claimant's administrative hearing after reviewing all of the evidence in the record. It was a valid consideration as to the persuasiveness of his opinion. The ALJ noted that Dr. Boggs was Claimant's treating primary care provider, but the ALJ was not required to elaborate any further on Dr. Boggs's treatment history of Claimant or familiarity with the evidence. Articulation of those factors were permitted, but not required, and Claimant fails to establish error in this regard.

Finally, Claimant argues that the ALJ selectively discussed her daily activities in support of his finding that Dr. Boggs's opinion was not persuasive by cherry-picking facts without acknowledging the extent that Claimant could perform those activities. This argument is also unavailing. Claimant notes that, although she reported that she could do some laundry and dusting, she required frequent breaks and help from her husband to get laundry out of the washing machine and move items for her to dust. (ECF No. 7 at 15). She could prepare frozen foods or sandwiches with help from her husband, but could no longer cook full meals because she could not stand and use her hands adequately. (*Id.*). She could shop for a limited time, but she needed to take breaks. (*Id.*).

The Fourth Circuit has emphasized that "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of

nondisability while ignoring evidence that points to a disability finding." *Arakas v. Comm'r, Soc. Sec. Admin.*, No. 19-1540, 2020 WL 7331494, at *9 (4th Cir. Dec. 14, 2020) (citation and markings omitted). The Fourth Circuit made clear that an ALJ cannot selectively cite evidence concerning the tasks that a claimant can perform while improperly disregarding qualifying or contrary evidence regarding the claimant's ability to perform those tasks. *Id.* at *11. In *Arakas*, *supra*, the ALJ erred by relying on the activities that the claimant could perform while failing to account for other significant evidence demonstrating the claimant's limited physical capacities. *Id.* Specifically, the ALJ noted that the claimant could use a computer, perform household chores, drive, shop, walk for exercise, cook, make her bed, do laundry and yard work, and paint. *Id.* at *10. However, the ALJ did not mention or address the claimant's considerable testimony regarding the difficulties that she had performing those tasks, such as that her daughter had to perform most of the housework, as well as the grocery shopping when the claimant was not physically able; and that the claimant could not do anything after noon due to fatigue; could only walk for 30 minutes "on a good day," but was "done for the day" after walking; and had to sleep in a neck brace. *Id.* at *11. In *Arakas*, the Fourth Circuit concluded that substantial evidence did not support the ALJ's conclusion that the claimant's subjective complaints were inconsistent with her daily activities, because the record, when read as a whole, revealed no inconsistency between the two. *Id.* at *11. Overall, the Fourth Circuit noted that, if the claimant's qualifying statements were properly considered, it was clear that "she could perform only minimal daily activities that in no way suggested any ability to engage in full-time work on a sustained basis." *Id.* at *12.

Unlike *Arakas*, in this case, the ALJ discussed Claimant's alleged limitations

26

performing daily tasks. The ALJ noted that Claimant reported that she had difficulty with buttoning clothing and caring for her hair, but she had no problems feeding herself, using the toilet, or driving. (Tr. at 112). The ALJ acknowledged Claimant's reports that she could do laundry, dust, and prepare frozen foods and sandwiches with assistance. (*Id*.). Although the ALJ did not reiterate in the RFC analysis all of Claimant's alleged limitations performing activities of daily living, the alleged restrictions were clearly considered and articulated in the decision. Claimant is again asking the Court to reweigh evidence and reach different conclusions than the ALJ. This evidence was clearly considered, and the ALJ ultimately determined that the activities that Claimant could perform, even with the limitations that she alleged, were inconsistent with Dr. Boggs's opinion. Claimant points out that the fact that she could perform sporadic daily activities was not inconsistent with a claim for disability. (ECF No. 7 at 16, 16 n.11). However, the ALJ did not adjudge her non-disabled solely based on her ability to perform some activities. It was one of many factors that the ALJ considered in evaluating Claimant's RFC and the persuasiveness of the opinions.

For those reasons, the undersigned **FINDS** that the ALJ's evaluation of the opinion evidence is supported by substantial evidence.

### B. Subjective Symptoms

Claimant next argues that the ALJ did not articulate any consideration of the 20 C.F.R. § 404.1529(c) factors, which Claimant contends supported her subjective symptoms and alleged functional limitations. (ECF No. 7 at 16-17). Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. § 404.1529 (effective March 27, 2017). First, the ALJ must

consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific

descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that

'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ performed the two-step process. The ALJ considered Claimant's multilevel degenerative disc disease, rheumatoid arthritis, fibromyalgia, and

Raynaud's Syndrome in her feet. (Tr. at 114). The ALJ cited Claimant's testimony that she dropped things because she had "no grip;" could not move well on "bad days;" had sharp pains in her legs and feet; her hands "lock[ed] up;" had difficulty writing; had swollen knuckles and sores on her feet; and had to constantly move while sitting due to back pain. (Tr. at 114-15). After considering the evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. at 115).

However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record" for several reasons. (*Id.*). Regarding back pain, the ALJ cited that Claimant received injections in April, July, and September 2019 and a sacral radiofrequency ablation in December 2019. (*Id.*). The ALJ noted that Claimant did not follow up for any subsequent pain management or with an orthopedist or neurosurgeon. (*Id.*). Therefore, the ALJ concluded that Claimant's back pain did not appear to be disabling. (*Id.*). The ALJ discussed that despite Claimant's inflammatory arthritis complaints, there were few abnormal findings on examination and she did not appear to be compliant with the frequency of treatment recommended. (*Id.*). The ALJ articulated that Claimant otherwise only pursued routine care consisting of medication management through her primary care provider. (Tr. at 116). The ALJ considered Claimant's complaints and abnormal findings, such as purple toes, but mentioned that Claimant had no weakness and walked without restriction. (*Id.*). The ALJ also discussed the medical opinions and Claimant's daily activities. (Tr. at 116-17).

Claimant identifies the following alleged flaws in the ALJ's subjective symptom analysis. First, she argues that the ALJ mischaracterized her daily activities and drew

unwarranted conclusions from them. (ECF No. 7 at 17). For the reasons previously discussed, the ALJ properly considered the activities that Claimant could perform and the extent that she could perform them. Claimant does not identify any errors in the analysis of her daily activities for the reasons provided.

Next, Claimant lists her complaints of pain, stiffness, and soreness, particularly in her hands and lower extremities. (*Id*.). Claimant concludes that, "[i]t cannot reasonably be disputed" that those subjective symptoms cast considerable doubt on the ALJ's finding that Claimant can work on a regular and continuing basis. (*Id*. at 18). However, the ALJ properly evaluated the location, duration, frequency, and intensity of Claimant's pain and other symptoms. The ALJ noted the location of Claimant's alleged pain and symptoms in her back, sacroiliac joint, feet, ankles, hands, and lower extremities. (Tr. at 115-16, 120). The ALJ discussed the duration and frequency of Claimant's symptoms, noting that Claimant complained that her toes were chronically purple, and Dr. Boggs diagnosed her with chronic pain. (Tr. at 116). In terms of the intensity of Claimant's alleged symptoms, the ALJ cited that Claimant complained of soreness and aching in her feet, ankles, and hands; fatigue; tenderness in various joints; and a flare of sciatica. (Tr. at 115-16, 120). As to other aggravating factors and treatment measures, the ALJ noted that Claimant reported increased problems with her feet in cold temperatures, but elevating her legs and using leg pumps helped her symptoms. (Tr. at 116, 120). Also, the ALJ cited that Claimant reported significant improvement in lumbar pain from injections and 75 percent improvement in pain for 15 days after sacroiliac injections. (Tr. at 115). The ALJ discussed the specific treatment modalities that Claimant received, including the specific dates and types of medications, steroid injections, and an ablation. (Tr. at 116, 120). The ALJ also considered Claimant's medical history, examination findings, x-rays and MRI findings,

and statements from treating and non-treating sources. (Tr. at 115-17). Overall, the ALJ's decision unequivocally demonstrates that he considered all of the relevant evidence, contrary to Claimant's assertion.

As a final matter, Claimant argues that the ALJ should have acknowledged in the subjective symptom analysis Claimant's uninterrupted 31-year work history prior to her alleged onset date. (ECF No. 18-19). The ALJ explicitly considered the entire record which documented Claimant's work history, including copies of her work history report and earnings information. (Tr. at 340-47, 282). Claimant does not identify any authority which required the ALJ to elaborate on her work history any further.

For those reasons, the undersigned **FINDS** that the ALJ's subjective symptom analysis is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 7); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 8); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to

file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** November 2, 2022

Cheryl A. Eifert
United States Magistrate Judge